**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

| | |
|---|---|
| **BETTY J. MURPHY,** | § |
| **PLAINTIFF,** | § |
| | § |
| **VS.** | § **CIVIL ACTION NO. 4:05-CV-020-Y** |
| | § |
| **JO ANNE B. BARNHART,** | § |
| **COMMISSIONER OF SOCIAL SECURITY,** | § |
| **DEFENDANT.** | § |

**FINDINGS, CONCLUSIONS AND RECOMMENDATION
OF THE UNITED STATES MAGISTRATE JUDGE
AND
NOTICE AND ORDER**

This case was referred to the United States Magistrate Judge pursuant to the provisions of

Title 28, United States Code, Section 636(b).  The Findings, Conclusions and Recommendation of

the United States Magistrate Judge are as follows:

FINDINGS AND CONCLUSIONS

A.    STATEMENT OF THE CASE

Plaintiff Betty J. Murphy brings this action pursuant to Sections 405(g) and 1383(c)(3) of

Title 42 of the United States Code for judicial review of a final decision of the Commissioner of

Social Security denying her claim for disability benefits under Title II and supplemental security

income or SSI benefits under Title XVI of the Social Security Act.  Murphy applied for SSI benefits

on May 7, 2002 (her protective filing date) and disability insurance benefits on June 17, 2002,

alleging disability beginning July 26, 2001.  (Tr.  61, 65). Murphy later amended her onset date to

May 1, 2002 because she had worked after 2001.  (Tr. 447-48).  She met the requirements for

**Findings, Conclusions and Recommendation of
the United States Magistrate Judge–Page 1**

disability insured status through the date of  the administrative decision.

After the Social Security Administration denied her applications for benefits initially and on reconsideration, Murphy requested a hearing before an administrative law judge (the "ALJ"), and ALJ J. Frederick Gatzke held a hearing on March 10, 2004 in Fort Worth, Texas.  (Tr. 444). Murphy was represented by counsel.  On May 26, 2004, the ALJ issued an unfavorable decision, finding that Murphy was capable of performing a modified range of sedentary work activity and was thus not entitled to disability insurance or SSI benefits.  (Tr. 15-23).   The Appeals Council denied Murphy's request for review of her case, leaving the ALJ's decision to stand as the final decision of the Commissioner.  (Tr. 3).

B.     STANDARD OF REVIEW

The Social Security Act defines a disability as a medically determinable physical or mental impairment lasting at least twelve months that prevents the claimant from engaging in substantial gainful activity.  42 U.S.C. § 423(d), 1382c(a)(3)(A); *McQueen v. Apfel*, 168 F.3d 152, 154 (5th Cir. 1999).  To determine whether a claimant is disabled, and thus entitled to disability benefits, a five-step analysis is employed.  20 C.F.R. §§ 404.1520, 416.920. First, the claimant must not be presently working at any substantial gainful activity. Substantial gainful activity is defined as work activity involving the use of significant physical or mental abilities for pay or profit. 20 C.F.R. §§ 404.1527, 416.972.   Second, the claimant must have an impairment or combination of impairments that is severe. An impairment or combination of impairments is severe if it has more than minimal effect on the claimant's physical or mental ability to do basic work activities. 20 C.F.R. §§ 404.1520(c), 416.920(c); *Stone v. Heckler*, 752 F.2d 1099, 1101 (5th Cir. 1985), *cited in Loza v. Apfel*, 219 F.3d

**Findings, Conclusions and Recommendation of
the United States Magistrate Judge**–Page 2

378, 392 (5th Cir. 2000). At the third step, disability will be found if claimant's impairment or combination of impairments meets or equals an impairment listed in the appendix to the regulations. *Id.* §§ 404.1520(d), 416.920(d). Fourth, if disability cannot be found on the basis of claimant's medical status alone, the impairment or impairments must prevent the claimant from returning to his past relevant work. *Id.* §§ 404.1520(e), 416.920(e). And fifth, the impairment must prevent the claimant from doing any  work, considering the claimant's residual functional capacity, age, education, and past work experience. *Id.* §§ 404.1520(f), 416.920(f); *Crowley v. Apfel,* 197 F.3d 194, 197-98 (5th Cir.1999).

At steps one through four, the burden of proof rests upon the claimant to show he is disabled. If the claimant satisfies this responsibility, the burden shifts to the Commissioner at step five of the process to show that there is other gainful employment the claimant is capable of performing in spite of his existing impairments. *Crowley*, 197 F.3d at 198. If the Commissioner meets this burden, the claimant must then prove that he cannot in fact perform the work suggested. *Waters v. Barnhart*, 276 F.3d 716, 718 (5th Cir. 2002). A finding at any point in the five-step process that a claimant is disabled or not disabled is conclusive and terminates the analysis. *Masterson v. Barnhart*, 309 F.3d 267, 272 (5th Cir. 2002).

A denial of disability benefits is reviewed only to determine whether the Commissioner applied the correct legal standards and whether the decision is supported by substantial evidence in the record as a whole. *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995); *Hollis v. Bowen*, 837 F.2d 1378, 1382 (5th Cir. 1988). Substantial evidence is such relevant evidence as a responsible mind might accept to support a conclusion. *Boyd v. Apfel*, 239 F.3d 698, 704 (5th Cir. 2001). It is

<u>**Findings, Conclusions and Recommendation of**</u>
<u>**the United States Magistrate Judge**</u>–Page 3

more than a mere scintilla, but less than a preponderance. *Id.* A finding of no substantial evidence is appropriate only if no credible evidentiary choices or medical findings support the decision. *Id.* This Court may neither reweigh the evidence in the record nor substitute its judgment for the Commissioner's, but will carefully scrutinize the record to determine if the evidence is present. *Harris v. Apfel*, 209 F.3d 413, 417 (5th Cir.2000); *Hollis*, 837 F.2d at 1383.

C.      ISSUES

Whether the Commissioner's decision is supported by substantial evidence and consistent with relevant legal standards.

D.      ADMINISTRATIVE RECORD

1.      Treatment History[1]

Murphy alleges that she is disabled by physical and mental impairments. Murphy was hospitalized for two days in March 2001 for chest pain suggestive of angina.  (Tr. 238-39). Myocardial infarction was ruled out after an electrocardiogram (EKG) was negative and cardiac enzyme test was normal.  (Tr. 237).  Murphy underwent a stress tress performed soon after she was discharged from the hospital.  She exercised for seven minutes and achieved 92% of her maximum predicted heart rate with a calculated ejection fraction of 56%.[2] (Tr. 215-16).

---

[1] The ALJ noted that Murphy had filed multiple applications for SSI benefits, including applications in 1994, 1997, 1998.  In 2000, Murphy filed concurrent applications for disability insurance and SSI benefits, and those applications were denied by another ALJ on July 25, 2001.  The ALJ declined to reopen any of the prior applications, (Tr. 15), and noted that any references to medical records before May 1, 2002 were being cited solely for historical purposes.  The decision not to reopen a previous application is not subject to judicial review.  *See Califano v. Sanders*, 430 U.S. 99, 97 S.Ct. 980, 51 L.Ed.2d 192 (1977).

[2] Ejection fraction is the proportion of the volume of blood in the ventricles at the end of diastole that is ejected during systole, and is often expressed as a percentage. It is normally sixty-five percent (plus or minus eight percent), and lower values indicate ventricular dysfunction.  Dorland's Illustrated Medical Dictionary 708 (29th ed.

Murphy saw her primary care physician for a check-up in May 2001.  Her diabetes was noted to be uncontrolled.  Murphy complained of depression and no motivation to get out of bed for two days.  (Tr. 265).  Since 1995, Murphy had been treated for depression by Pecan Valley Mental Health and Mental Retardation services (MHMR), and her treatment continued through the date of the administrative hearing. (Tr. 274-316, 353-60).

On July 8, 2001, Murphy went to the emergency room because she was depressed after a fight with her boyfriend and was having thoughts of harming herself, but she left the emergency room about two hours later without advising the staff.  (Tr .183-85).   In August 2001, Murphy returned to the hospital with complaints of swelling in both legs.  She was discharged after a four-day stay with a diagnosis of bilateral deep venous thrombosis (DVT)[3] that responded well to treatment.  (Tr. 190-207).  An echocardiogram performed August 28, 2001 established an ejection fraction of 74%.  (Tr. 188).

Murphy went to the emergency room again in September 2001 after an altercation with her boyfriend.  The emergency room record documents suicidal ideations with a previous suicide attempt by overdose.  Murphy was diagnosed with major depression and released from the emergency room.

During a check-up with her primary care physician in January 2002, Murphy reported that

2000). Diastole is the dilation of the heart, while systole refers to the contraction, or period of contraction, of the heart.  *Id*. at 494, 1781.

[3] Thrombosis refers to formation, development or presences of a thrombus, which is a stationary blood clot along the wall of a blood vessel.  *Id*. at 1836-37.   DVT is thrombosis of one or more of the deep veins of the lower limb, characterized by swelling, warmth, and erythema, and frequently a precursor of a pulmonary embolism.  *Id*. at 1836.

**Findings, Conclusions and Recommendation of
the United States Magistrate Judge**–Page 5

she was not taking her medications.  Her blood sugar level was 215.  She was instructed to restart her medications.  (Tr .262).

Murphy was hospitalized in May 2002 for atypical chest pain.  An EKG showed no acute changes, and a treadmill stress test was normal.  An echocardiogram showed an ejection fraction of 68%.  (Tr. 154-82).   Murphy went to the emergency room in October with renewed complaints of chest pain . She was discharged with reported diagnoses of anxiety, DVT, and congestive heart failure.[4] (Tr. 145).  Murphy continued to complain of chest pain and pain and swelling in her lower extremities during check-ups with her physician in 2003.  (Tr. 343-51).

Murphy underwent a consultative psychological evaluation with Bobbie Hart Lilly, Ph.D., on February 12, 2003.  (Tr. 318).  Murphy identified both physical and mental problems, including diabetes, high blood pressure, and a history of depression.  Murphy reported that she had a pattern of seeking help from MHMR, improving, discontinuing her medications, and getting sick again.  (Tr. 318).  She had been consistent in her attendance at MHMR for the past three years, but continued to have mood swings, periods of isolation, disturbed sleep, poor appetite, low energy levels, impaired concentration, and feelings of worthlessness, helplessness, and hopelessness.  (Tr. 318).  Murphy also described some paranoid feelings.

Murphy described an abusive childhood and physical abuse during three marriages.  Murphy complained of problems with anxiety and an inability to be in noisy situations–including visits with her grandchildren.  She said she had panic attacks that made her chest hurt and caused difficulty breathing, sweaty palms, and hot flashes.  (Tr. 318).  Murphy generally disliked being around people

---

[4]  A portable chest x-ray taken during the visit showed no evidence of congestive heart failure.  (Tr. 152).

**Findings, Conclusions and Recommendation of
the United States Magistrate Judge**–Page 6

except for her group therapy sessions twice a week at MHMR. (Tr. 319). Murphy had most recently worked at Wal-Mart, but she stated that she stopped working because she had difficulty concentrating and dealing with money and she could not stand for eight hours. (Tr. 319).

Murphy was able to tend to her own hygiene and grooming needs, but had some difficulty putting on her shoes because bending was painful. She lived with her youngest daughter and son-in-law and their two children, but did not like the situation because her daughter did not keep the house clean enough. (Tr. 319). Murphy did few chores because she tended to forget what she was doing and was easily distracted. She accompanied her daughter to the grocery store, but had difficulty remembering the items they needed to purchase. Murphy was unable to answer the simple arithmetic questions that Lilly asked. Murphy said she was unable to balance a checkbook, but could probably pay bills if she had to do so. Murphy also stated that she did not know how to use a telephone directory and had difficulty following directions. (Tr. 319).

Murphy reported having no friends or support system; no hobbies; and no membership in any social groups. She attended church regularly and visited with her grandchildren. (Tr. 319). She said that she tended to drag out tasks, and when stressed, she broke down and needed to get away from the situation. (Tr. 319).

Murphy was cooperative during the interview, but somewhat quiet and withdrawn. She knew the day and date, but said it was noon when her appointment time was 3:00 p.m. (Tr. 320). Her thought content was coherent with no loose associations. She demonstrated difficulty counting from one to twenty forward and counting backwards from twenty. Murphy was able to remember one of a list of three items when tested after five minutes, and had difficulty remembering a list of

**Findings, Conclusions and Recommendation of**
**the United States Magistrate Judge–Page 7**

numbers.  Murphy did not know the name of the current President, but recalled that Clinton was a recent President.  She was unable to perform serial 7s, and had two accurate responses out of five attempts to perform serial 3s.  She also demonstrated deficiencies in the areas of abstract thinking and judgment.  (Tr. 320).

Lilly diagnosed recurrent major depression with some suicidal ideations and a panic disorder with agoraphobia.  Lilly assigned a current Global Assessment of Functioning (GAF) score of 50,[5] and opined that Murphy could not manage benefits in her own best interest due to a lack of mathematical ability, insight, and judgment. (Tr. 321).

Murphy's primary care physician, Sat Gupta, D.O., ordered magnetic resonance imaging (an MRI) in December 2003 because Murphy complained of lumbar pain with weakness in her right leg.  The MRI showed mild L3-L4 discogenic disease.  (Tr. 343).

In March 2004, Sat P. Gupta, D.O., stated that Murphy's uncontrolled diabetes mellitus, depression, obesity and history of DVT caused difficulty ambulating and required that Murphy elevate her legs when sitting to reduce the swelling and pain in her lower extremities.  (Tr. 434).  Gupta opined that Murphy would not be a viable employee because of the foregoing limitations.  (Tr. 434).

2.    Administrative Hearing

Murphy was forty-six years old on the date of the administrative hearing.  (Tr. 447).  She

---

[5]  A GAF score is a standard measurement of an individual's overall functioning level with respect to psychological, social, and occupational functioning. AMERICAN PSYCHIATRIC ASSOCIATION, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 32  (4th ed. 1994).   A GAF score of 41 to 50 indicates serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational or school functioning (e.g., no friends, unable to keep a job).  DSM-IV at 34.

**Findings, Conclusions and Recommendation of**
**the United States Magistrate Judge–Page 8**

testified that she has a tenth grade education and work experience as a bartender, nurses' aide, cashier, dishwasher, and fast food clerk.  (Tr. 83, 448).  She last worked in May 2002 as a cashier at Wal-Mart, but testified that she quit because of her depression and because standing for eight hours a day caused her legs to swell.  (Tr. 447-50).

Murphy testified that her leg problems were attributable to her diabetes.  She kept her feet elevated as much as possible to alleviate the swelling.  (Tr. 451).  She was on three medications for her diabetes, but continued to have difficulty controlling her blood sugar levels.  (Tr. 452).  Murphy estimated that she could sit with her feet on the floor for no more than thirty minutes before the swelling required her to elevate her legs.  The swelling also affected her ability to stand and walk. She was able to stand for approximately fifteen minutes and was able to walk around her house, but not much farther.  (Tr. 453).  Murphy complained of burning and tingling in her feet and legs. Murphy testified that her physicians had counseled her about losing weight because she was 5'4" and weighed about 280 pounds.  (Tr. 456).

Murphy was taking high blood pressure medication and continued to experience daily episodes of chest pain.  (Tr. 453-54).   She was on the medication Celebrex for arthritis, and used Prozac and Buspar to treat her depression.  (Tr. 454).  Murphy also attended group counseling sessions at MHMR twice a week.  The sessions helped, but her mood and appetite continued to vary. Murphy complained that her sleep was restless, but she did nap in the afternoons.  She also complained of difficulty with her concentration and memory.  (Tr. 457-58).

Murphy testified that she lived with her father, who did most of the housework.  Murphy did not think she could work because she needed the opportunity to prop up her feet and legs.  (Tr. 459).

**Findings, Conclusions and Recommendation of
the United States Magistrate Judge**–Page 9

Vocational expert Donna Humphries also testified during the hearing.  Humphries classified Murphy's previous job as a cashier as light, unskilled work; bartending as light, semi-skilled work; nurses' aide as medium, semi-skilled work; dishwasher as medium, unskilled work; and fast food worker as light, unskilled work.  The ALJ asked Humphries to consider

> a hypothetical individual then the same age, education and work experience as the Claimant limited to work at the sedentary exertional level, which permitted the intermittent opportunity throughout the work day to elevate the legs at the stool level, would there be any jobs that exist in the national economy such an individual could perform?  By stool, I mean step stool about a foot off the ground.

(Tr .465).  Humphries testified that there were several suitable jobs that would accommodate an individual's need to elevate their legs, including: assembly (with 2,000 jobs available in Texas and 40,000 jobs nationally), surveillance system monitor  (with 2,000 jobs available in Texas and 40,000-45,000 jobs nationally), and inspecting, sorting or grading positions (with approximately 500-600 available in Texas and 8,000-10,000 jobs nationally).  (Tr. 466).  All of the jobs identified were unskilled.  Humphries testified that none of the jobs would allow a person to elevate her legs above hip level while working.  (Tr. 466).

3.    ALJ Decision

The ALJ found that Murphy had not engaged in substantial gainful activity since May 1, 2002.  He found that Murphy's diabetes mellitus, obesity, hypertension, and degenerative disk disease constituted severe impairments, but concluded that Murphy had no impairment or combination of impairments that met or equaled the severity of any listed impairment. (Tr. 16).  The ALJ specifically found that Murphy's depression and history of deep venous thrombosis were not severe impairments for purposes of the Social Security Act.  (Tr. 16).

**Findings, Conclusions and Recommendation of**
**the United States Magistrate Judge**–**Page 10**

The ALJ evaluated Murphy's residual functional capacity and determined that she retained the ability to perform sedentary work activity that afforded her the intermittent opportunity to elevate her legs at stool level    Based on the vocational evidence, the ALJ found Murphy was unable to return to her previous work, but was capable of performing other work existing in significant numbers in the national economy. (Tr. 22). The ALJ concluded that Murphy was not disabled and was not eligible for disability insurance or SSI benefits. (Tr. 23).

D.      DISCUSSION

Murphy asserts that the ALJ failed to properly evaluate all of her impairments and their impact on her ability to perform basic work-related activities.

Murphy contends that the ALJ failed to follow the mandatory procedure for assessment of mental impairments. The Social Security disability regulations outline a process (referred to as "the technique") to be used for evaluation of mental impairments. First, symptoms, signs, and laboratory findings are evaluated to determine whether the claimant has a medically determinable mental impairment.  20 C.F.R. §§ 404.1520a(b)(1), 416.920a(b)(1).  Once an impairment is found, the administration will rate the degree of functional limitation resulting from the impairment.  *Id*. §§ 404.1520a(b)(2), 416.920a(b)(2).  Four broad functional areas are recognized:  (1) activities of daily living; (2) social functioning; (3) concentration, persistence, and pace; and (4) episodes of decompensation.[6]  *Id*. §§ 404.1520a(c)(3), 416.920a(c)(3).  After rating the claimant's functional

---

[6] At the initial and reconsideration levels, a standardized document referred to as a Psychiatric Review Technique Form (PRTF) is prepared to record how the above technique has been applied. *Id*. §§ 404.1520a(e)(1), 416.920a(e)(1).  At the ALJ and Appeals Council levels, the written decision itself incorporates the pertinent findings and conclusions based on the technique, including specific findings as to the degree of limitation in each of the functional areas.  20 C.F.R. §§ 404.1520a(e)(2), 416.920a(e)(2).

<u>**Findings, Conclusions and Recommendation of**</u>
<u>**the United States Magistrate Judge**</u>–Page 11

limitations, the administration determines whether the impairment is severe or not severe given the degree of functional loss found in the four given areas.  *Id*. §§ 404.1520a(d), 416.920a(d).

A review of the ALJ's decision reflects that the ALJ substantially followed the appropriate technique.  The ALJ addressed Murphy's treatment history for depression and her related subjective complaints, but found no limitations in Murphy's daily activities that were attributable to her depression, only mild limitation in Murphy's social functioning and her concentration, persistence and pace, and no episodes of decompensation.  (Tr. 19).  When the degree of mental limitation in the four given areas is none or mild, the mental impairment is generally not found to be severe unless the evidence otherwise indicates more than minimal limitation in the claimant's ability to perform basic work activities.  20 C.F.R. § 404.1520a(d)(1).

Murphy contends that her depression had more than a minimal effect on her ability to perform basic work activities, and as a result, consideration of depression should have proceeded beyond step two of the sequential evaluation process.  She disagrees with the ALJ's decision that her depression was not severe, and notes that Lilly assessed a GAF score of 50, which is indicative of serious symptoms and consistent with other evidence that demonstrated serious impairment in Murphy's social functioning.

The ALJ declined to adopt Lilly's opinions about the severity of Murphy's mental impairment, (Tr. 17), because it was inconsistent with the notes and conclusions of treating psychiatric sources. MHMR notes from Murphy's treating psychiatrists in 2002-2004 reflect GAF

score of 60 or 65-70.[7] (Tr. 274-84). The ALJ also noted that Murphy's treating psychiatrist reported in January 2003 that Murphy's primary limitations were physical. (Tr. 274). The ALJ's determination that Murphy's depression was not a severe impairment is supported by substantial evidence.

Murphy alternatively contends that the ALJ erred in treating Murphy's depression separately, rather than considering the combined effect of all of her impairments in accordance with the regulations. In determining whether a physical or mental impairment or impairments are of a sufficient medical severity that such impairment or impairments could be the basis of eligibility under the law, the Social Security Administration considers the combined effect of all impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity. 20 C.F.R. §§ 404.1523, 416.923.

Murphy asserts that Gupta offered a medical source statement in March 2004 that confirms that her combination of impairments, including depression, are disabling. The ALJ affirmatively stated that Murphy had no combination of impairments that met or equaled the severity of any listed impairment. He addressed Gupta's statement, but found that the objective evidence failed to support

---

[7] A GAF score of 51-60 reflects moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational or school functioning (e.g., few friends, conflicts with peers or co-workers). DSM-IV at 34. A GAF score of 61-70 reflects mild symptoms. *Id.* Murphy notes that there is at least one lower GAF score reflected her MHMR records and refers to a score of 40 recorded in December 7, 1999, while Murphy was still working and almost two and a half years before her alleged onset date. (Tr. 60, 281).

**Findings, Conclusions and Recommendation of**
**the United States Magistrate Judge**–Page 13

Gupta's conclusion that Murphy was disabled.[8]  (Tr. 18-19).  The ALJ also noted that Murphy had been treated for depression since 1995, and when she quit working, Murphy had advised her treating psychiatrist that she quit because of physical problems related to her diabetes.  (Tr. 16, 284). Murphy presents no error in the ALJ's reasoning.[9]

Murphy contends that the ALJ erred in rejecting the diagnosis of panic disorder as assessed by consulting examiner Lilly.  The ALJ declined to find a panic disorder existed because Murphy had no reported panic disorder symptoms recorded in her MHMR records, which Murphy does not dispute.  The ALJ found that Lilly appeared to be acting solely based on Murphy's subjective complaints during the consultative examination.[10]

In compliance with Social Security Ruling 96-5p, disability adjudicators must weigh a medical source's assessment under the rules of 20 C.F.R. § 404.1527 and § 416.927 and provide explanations for accepting or rejecting the medical source's opinion. SOCIAL SECURITY RULING 96-5p.  But the law is clear that, although the opinion of an examining physician is generally entitled to more weight than the opinion of a non-examining physician, the ALJ is free to reject the opinion of any physician when the evidence supports a contrary conclusion.  *Bradley v. Bowen*, 809 F.2d

---

[8]  Notably, Gupta opined that Murphy's inability to ambulate effectively and her need to elevate her legs were limitations on her employability.  Gupta did not identify specific work-related limitations attributable to Murphy's depression.  (Tr. 434).

[9]  Murphy insinuates that her combined impairments meet or equal a listed impairment, but never identifies which listing is satisfied and cites no evidence demonstrating that she meets or equals all criteria of a given impairment.

[10]  The state agency medical consultant also noted this incongruity between Murphy's psychiatric treatment history and Lilly's diagnosis.  (Tr. 328 ,335).

**Findings, Conclusions and Recommendation of
the United States Magistrate Judge–Page 14**

1054 (5th Cir. 1987). The weight to be given a physician's statement depends on the extent to which it is supported by specific and complete clinical findings and is consistent with other evidence as to the severity and probable duration of the individual's impairment or impairments. *See generally* 20 C.F.R. §§ 404.1527, 416.927.   Here, the ALJ provided sufficient reasons for rejecting Lilly's diagnosis of a panic disorder in light of the objective record evidence.

Murphy contends that the ALJ did not properly evaluate her diabetes mellitus, particularly Gupta's determination that Murphy had problems with ambulation that would interfere with her ability to work.   The ALJ found that Murphy had demonstrated no sustained difficulties with ambulation, contrary to Gupta's assertion. (Tr. 19).   Although the ALJ conceded that pain might cause some functional loss in the amount of time that Murphy could spend standing or walking, he ultimately found no evidence that Murphy was unable to sustain a reasonable walking pace over a sufficient distance to carry out her daily activities or that she required the assistance of a walker or canes.  (Tr. 19).  The ALJ gave adequate attention to Murphy's ability to ambulate effectively for purposes of performing a modified range of sedentary work activity.[11]

The Commissioner's decision is supported by substantial evidence and has not been shown to be a product of legal error.

<u>RECOMMENDATION</u>

It is recommended that the Commissioner's decision be affirmed.

---

[11]   Murphy asserts that difficulty with ambulation is a factor in Listing 9.08(A), addressing diabetes, but she does not argue or provide evidence that she meets all of the criteria to satisfy this listing.  *See generally* 20 C.F.R. Part 404, Subpart P, App. 1, § 9.08(A).

**Findings, Conclusions and Recommendation of
the United States Magistrate Judge–Page 15**

NOTICE OF RIGHT TO OBJECT TO PROPOSED
FINDINGS, CONCLUSIONS AND RECOMMENDATION
AND CONSEQUENCES OF FAILURE TO OBJECT

Under 28 U.S.C. § 636(b)(1), each party to this action has the right to serve and file specific written objections in the United States District Court to the United States Magistrate Judge's proposed findings, conclusions and recommendation within ten (10) days after the party has been served with a copy of this document. The court is hereby extending the deadline within which to file specific written objections to the United States Magistrate Judge's proposed findings, conclusions and recommendation until October 18, 2005. The United States District Judge need only make a *de novo* determination of those portions of the United States Magistrate Judge's proposed findings, conclusions and recommendation to which specific objection is timely made. *See* 28 U.S.C. § 636(b)(1). Failure to file by the date stated above a specific written objection to a proposed factual finding or legal conclusion will bar a party, except upon grounds of plain error or manifest injustice, from attacking on appeal any such proposed factual findings and legal conclusions accepted by the United States District Judge. *See Douglass v. United Services Auto Ass'n*, 79 F.3d 1415, 1428-29 (5th Cir. 1996)(en banc).

ORDER

Under 28 U.S.C. § 636, it is hereby ORDERED that each party is granted until October 18, 2005 to serve and file written objections to the United States Magistrate Judge's proposed findings, conclusions and recommendation. It is further ORDERED that if objections are filed and the opposing party chooses to file a response, the response shall be filed within seven (7) days of the

**Findings, Conclusions and Recommendation of
the United States Magistrate Judge–Page 16**

filing date of the objections.

It is further ORDERED that the above-styled and numbered action, previously referred to the United States Magistrate Judge for findings, conclusions and recommendation, be and hereby is returned to the docket of the United States District Judge.

SIGNED SEPTEMBER 27, 2005.


_____/s/ Charles Bleil_____

CHARLES BLEIL
UNITED STATES MAGISTRATE JUDGE